West case is Sanchez-Gonzalez v. Garland. Mr. Sanchez-Gonzalez v. Garland West case is Sanchez-Gonzalez v. Garland West. And I'll call the roll. Thank you, Your Honor. And may it please the court. My name is Caitlin Bailey and I represent the petitioner. Mister Marvin role. Sanchez-Gonzalez. Mister Sanchez-Gonzalez fled Honduras as a teenager. After being kidnapped, threatened and tortured by MS-13. He now raises five challenges to the agency's denial of his asylum, withholding of removal and cat claims. All five arguments merit reversal of the agency's decision. But we begin today with the agency's failure to properly apply the at least one central reason standard to Mr. Sanchez-Gonzalez asylum and withholding of removal claims consistent with this court's precedent. As this court found in a trial versus holder, the possibility of multiple motives for persecution precludes a type of either or approach when evaluating mixed motive cases. And analyzing multiple motive cases in competition with one another rather than in concert constitutes legal error. Yet here, the immigration judge engaged in the same either or approach that was rejected in a trial. By evaluating the primary and central motive of MS-13 rather than whether at least one central reason for Mr. Sanchez-Gonzalez's persecution was his relationship with his father. I thought the conclusion was that these were not corroborated. There were multiple reasons, but that they were not sufficiently corroborated. Wasn't that the conclusion?  But we have sufficiently challenged that by raising legal arguments on this case. But if you're wrong about, if that finding is sustainable, then you would lose at least some of the first two claims, right? No, Your Honor. On asylum and withholding of removal, or am I missing something? No, Your Honor. If an I.J. says insufficient corroboration on all your reasons, don't you lose on those claims? So the I.J. found that Mr. Sanchez-Gonzalez was not persuasive, although he was credible. And that's why he concluded that he had not established that it was more likely than not in this case. But the Board of Immigration Appeals doesn't actually address that conclusion. It notes only that credible testimony requires corroboration, which Mr. Sanchez-Gonzalez did submit in this case through both his- What was the corroboration? It seemed to me that the parents' letters don't link any of the harm to the father's military service, to his employment. They don't confirm the allegations that the gang tried to recruit the brother. The parents' letter doesn't corroborate his claim, right? On the nexus part of it, at least. The immigration judge did not credit the parents' letter or the sister's letter, yes, Your Honor. But Mr. Sanchez-Gonzalez submitted additional corroborating evidence, including both his country conditions evidence, as well as- No, Your Honor. Well, the country conditions went to the cat claim. On the, you have to have a nexus, right? Yes, Your Honor. He did not create a nexus. The nexus to the father's military service, the IJ found, was not corroborated by anything, not by the parents' letters, not by the sister's letter. So what was wrong about that? So, Your Honor, we think the error there is that it just didn't sufficiently consider the record as a whole. And as this court- What was the corroboration on the connection to the father's military service other than your client's statement? There was our client's statement. There was also an expert report submitted in this case by Dr. Eric Hirschberg, which detailed some of the evidence. The country conditions evidence that people similar to Mr. Sanchez-Gonzalez have been persecuted based on their familial relationships were former members of the Honduran- where the familial relationship was a former member of the Honduran military. Even if that's a country condition, you still have to show in his case that that was the reason, right? Just because that's a possibility in the country based upon country conditions, you still have to have some corroboration that in this case, that was the reason, right? Yes, Your Honor, but consistent with what this court held in Barahona v. Garland, this court similarly considered whether a petitioner had waived a challenge to the factual findings and found that when the argument is that the immigration judge overlooked or misconstrued evidence, as is the argument in this case, that there was no finding of waiver. I wanted to ask you about the cat claim and the country conditions. I think your argument on that is that the agency failed to consider his status as a criminal deportee. Am I framing the argument correctly on that? It's not just that he was a criminal deportee, Your Honor. The argument as to the more likely than not standard in cat is that he failed to consider the aggregate risk of torture as a whole. Sorry, failed to consider the, I didn't hear you clearly. The aggregate risk of torture, Your Honor, and that's consistent with this court. They determined that both the IJ and the BIA affirmed and also addressed the criminal deportee issue, said that there's evidence, for example, in the 2020 Human Rights Report, that the government is taking steps to address torture within government with both respect to the gang and with respect to government in multiple different ways. So why is that? We can only overturn it if a reasonable person would be compelled to reach another conclusion. So why isn't that a sufficient basis for them to have had a substantial evidence for the cat claim?  Your Honor, because in consistent with this court's precedent in De La Rosa, it doesn't consider whether or not any government official would acquiesce to the torture, which is the appropriate standard. So it can look to the country conditions evidence, and when the immigration judge did so, our contention is that it failed to properly consider the country conditions evidence as a whole. Let me ask you about that. There is a Canadian report of government officials turning over deportees to gangs, but it's described as uncommon. Yes, Your Honor. And so how does that compel a conclusion that your client faced a risk of torture? Because his status as a criminal deportee is not the only reason that he faced a risk of torture. In addition, Mr. Sanchez-Gonzalez had formerly been tortured by MS-13, and so that's a risk that should be considered in the aggregate, as is his risk as the son of a former Honduran military member. And so we believe that when the immigration judge looked to that evidence, he should have aggregated the likelihood of harm. The immigration judge said the government is taking steps to investigate instances of abuse and torture, investigate abuses within the military, and train law enforcement officials in human rights compliance. So that is the aggregate. It's looking at that they're training them to not torture for any reason, right? Am I missing out? I guess I'm not understanding. If there's evidence that they're trying to teach both their government officials to avoid any torture and to address the gang, why that's not sufficient? That's not sufficient, Your Honor, because it doesn't consider the risk that any government official would participate in Mr. Sanchez-Gonzalez's torture. Is that your view, that if they can point to even one person employed by the government who might tolerate it, that that is sufficient for your client to get capitally? Yes, Your Honor, and that's consistent with what this court found in Garcia Aranda, which mentioned that even lower-level police officers, the acquiescence of those police officers, could be sufficient for a CAT claim. You're talking about if there's a hypothetical possibility, right? It's assessing the likelihood, Your Honor, so yes, it's hypothetical in a sense. So where you've got the efforts that Judge Bianco alluded to and the risk being acknowledged but uncommon in the country report, you think you've developed a record that compels the conclusion that he's entitled to CAT relief? Yes, Your Honor, because the immigration judge needs to assess whether or not these attempts to combat gang violence have been successful, and what the record details is that the attempts have not been largely, and that's included, for example, in the UNHCR report as well as in other— Wasn't that a—what year was that report? They're relying on the 2020 report. I think the other report was 2016, right? The UNHCR report is 2016, Your Honor, yes. So why—the 2020 report that I read to you is four years after that, right? Yes, Your Honor. The court could also look to the Insight Crime Honduras profile, which is from 2021, and that's similarly recognized that there's still a severe risk of gang harm there. All right. Thank you. Tell me about something else. I mean, there is something a little bit disquieting about thinking that you're more likely to get relief from deportation if you commit a crime in this country than if you don't. So it's in that context that we're considering, well, is your status as a criminal—as someone with a criminal record put you at greater risk in the foreign country? And where you only have evidence that the police abuse in turning folks like this over to gangs is uncommon, you think that that's enough to say you get relief? So I think it goes, again, to the aggregate risk question, Your Honor. So his status as a criminal deportee is one way that he can show more likely than not, but that could be, for example, 5 or 10 percent. But if the other portions of the record detail that because he was formerly targeted by MS-13 and because of his familial relationship with the military, which makes him more likely to be targeted as well, if that— I'm not sure I made myself clear. I mean, you're saying that someone who's committing crimes in this country nevertheless gets to stay here because of the risk in the foreign country. It seems to me we might have an interest in wanting more than an uncommon risk in those circumstances. We understand the question, Your Honor. And I think the response there is that criminal deportees are understood differently in Honduras and other countries. And what Mr. Sanchez-Gonzalez did in this case is not the sort of really serious crime that you might have at issue in other cases. And so because of that, when he goes back to Honduras, or if he were to go back to Honduras, the way that he is perceived as a criminal deportee is more serious. But, again, the court doesn't even need to— Only if it results in torture. Yes, Your Honor. I mean, you know, the fact that they don't view favorably people coming back into their country who have criminal records is not enough. It's that he would face torture. That's correct, Your Honor. Okay. Thank you. Thank you. Thank you, Ms. Bailey. We have two minutes for rebuttal. We'll hear from the Governor, Mr. Kelch. Good morning. May it please the Court, my name is Greg Kelch, and I represent the U.S. Attorney General. In the government's view, this case could be distilled down to two essential issues. And that could be the nexus issue for the persecution and acquiescence for the torture claim. And I'll proceed on those lines, first starting with the nexus. What is the actual evidence here that he was targeted for anything other than crime? Well, one is his statement that friends told him that gang members were looking for him and described him as the son of a soldier. And then his statement in his declaration that gang members told him they were targeting him because he was the son of a military man. But in that declaration, he also said they expressed concern that I was soon going to join the military, which makes sense if they're trying to get information from him, out of him, from his father. The immigration judge considered that evidence and concluded that these statements by gang members would be nothing more than just descriptive statements. Then the immigration judge in his decision... Nothing more than what, did you say? So that descriptive term for him, he's the son of the soldier. And Mr. Sanchez testified in court also that, Your Honor, that everyone in town knew his dad had been in the military. So that makes sense. And the immigration judge here did not fail to conduct a proper one-century reason analysis. He cited the standard at the beginning of his decision. The standard is at least one central reason. He made a factual finding about what was the gang's motivation. It was for crime. And then he went through each of the proposed particular social groups and the political opinions, and in each of them, compared them to the crime and found that this is nothing more than minor incidental or tangential. The phrase he used, as I recognize, is no nexus. But that's what nexus means. For it to be nexus, it has to be more than minor incidental or tangential. It has to be at least one central reason. And Judge Bianco, as you noted, this petitioner has some persuasiveness problems. His testimony is sort of all over the map here. So he's not going to qualify for the coding of removal just based upon his testimony alone. And none of the corroborative evidence that he provides about this particular incident and his particular problems, those are the statements from his family, really established that there's any nexus here to a protected ground. This was all about crime. The gang members were targeting him because his father worked as a security guard and they wanted him to get information from his dad that they could then use to go and rob local businesses. And unfortunately, that's crime. It's not persecution. And so withholding a removal does not provide protection for that. And so this case is not like Acharya because the I.J. used the correct standard. It's not like Delgado where the I.J. failed to consider whether he has been targeted because he had escaped from the gang. The I.J. specifically discussed that. And also, as to his criminal record, I want to remind the court, his criminal record is a DUI. He's not a gang member. I see no evidence in this record that says that Honduran authorities are persecuting people who have DUIs. So on that, he does not qualify for withholding of removal. So now we move on to cap protection. And as I said, I think that can be resolved with the acquiescence issue. Mr. Sanchez claims to face a risk of torture from two very distinct groups. One would be police officers who would torture him for his criminal record, his DUI. And the other would be gang members who might torture him to get this information about local security businesses. Let's talk first about the police. He is not going to be tortured because of his DUI conviction in the United States. There is no record evidence that says Honduran police torture people with DUIs. Now, as this court has probably seen in many cases from Honduras, you know that Honduran police are tough on gangs. And sometimes for gang members, when they go back, that law enforcement can raise allegations of human rights abuses. And Judge Radji, I agree with you. It is disquieting to think that we offer protections to people because of their criminal conduct, but that is the state of the law. Indeed, if there's a risk of torture as a result of that. A probability. Yeah, a probability of torture. Mr. Sanchez is not a gang member, which in this case actually weakens his claim. He's not going to be tortured in Honduras by the police because of his DUI. I do recognize he has another arrest for something having to do with a child. I'm not aware of any conviction for that. He did not have a conviction for the immigration judge. I'm also not aware of any country conditions evidence that says that Honduran police are torturing people who have those sorts of arrests. He hasn't met his burden of proof. So now we come to the gang members. Is there acquiescence? The immigration judge thought it was important in this case that at no point had Mr. Sanchez ever gone to the police to seek help. He claims to be afraid of the police, but yet his own father was in the military and works in security. And that wasn't the only basis for the immigration judge's decision. It wasn't a litmus test of any sort. But the immigration judge noted we hadn't gone to the police to make them aware of his problems. Plus there's record evidence that Honduran authorities are cracking down on road police officers. There's reduced crime rates. And the immigration judge made a determination that if torture were to occur, it wouldn't be with the consent or acquiescence of a public official. And that's what fact finders do. And that's supported by substantial evidence. And also as to the point about de la Rosa, I do want to remind the court that the immigration judge cited de la Rosa in his decision for exactly the point that Mr. Sanchez is arguing. He said on page 180, the fact that some officials take action to prevent torture is not enough to preclude a finding of government acquiescence. So again, the immigration judge, he understood the law. He applied the law and found that Mr. Sanchez hadn't met his burden of proof. Now on one point about aggregate risk, there's nothing in the decision to suggest that the immigration judge didn't consider the aggregate risk. And of course the BIA considered the issue. The only way for the immigration judge to discuss the evidence intelligently was to discuss it separately. He first had to talk about the risk of harm from the police. And then he had to talk about the risk of harm from gangs. Which the immigration judge very wisely did not make a, did seem not to want to make a finding about what is going to happen. Instead resolved it on acquiescence grounds. That if torture were to occur, it wouldn't be with a consent or acquiescence of a public official. Which is one of the burdens that Mr. Sanchez had to meet. It seems from our reading of his argument is that he kind of wants to mix and match here. He wants to take the risk of harm from gangs and then apply that to the state action that would result if he were tortured by the police. And the cap protection doesn't allow him to do that. It's torture by the government or with a consent or acquiescence of the government. So if he faces a risk of torture from multiple gangs and the government is willfully blind to all of those gangs. The acquiescence of the police, that's their argument. Correct. So in our point today is we just want to note that that is separate from being tortured by the police because of a DUI. And so with that, we feel that that would really resolve the whole case. I will say briefly with the minute and 30 that we have left. The agency did correctly determine or properly determine that the asylum application was untimely. And we stand by our argument for the reasons stated in our brief that the court lacks jurisdiction to review that. It's extraordinary circumstances to the satisfaction of the attorney general. And it's simply not subject to judicial review. Thank you. Thank you. Miss Bailey, you have two minutes. May it please the court. I'd like to start with something that the government raised in their argument, which is that Mr. Sanchez Gonzalez has not properly demonstrated acquiescence by a government official. Mr. Sanchez Gonzalez doesn't need to show that the police are more likely than not to torture him because he is a criminal deportee. He can show that the that the government would be willfully blind to his torture by MS-13. Were he beach, were he to be returned to Honduras? And we believe that is what the record demonstrates in this case. How is that so when he never reported his his being tortured before? So we have no idea what if any actions the police would take in his case. So the prior reporting is not required, Your Honor, in a situation where an applicant has been previously tortured. And that's consistent with this court's precedent. Someone who you're now saying is concerned that the police would turn a blind eye if he were tortured by gangs. And the IJ and BIA specifically rejected that argument, saying that they think that there's no evidence to support that by someone who never complained to the police about his mistreatment by the gangs. So we think there is evidence to support that, Your Honor. So, for example, there's a Human Rights Watch Honduras events report that's included in the certified administrative record at pages 735 and 736. Which details that the police is largely ineffective at protecting individuals from gang violence. And that's consistent with what Mr. Sanchez-Gonzalez testified to himself in his declaration. But there's other evidence that they have made efforts, they've made strides, that there's improvement. That's what the IJ balanced here. Well, the IJ does cite to a number of statistics that the homicide rate in Honduras had decreased after 2011. But there are two responses to that. The first is that Dr. Eric Hirshberg's expert report explains that there's reason to doubt these statistics because of the level of corruption in the Honduran government. And the IJ and the BIA did not even address Dr. Hirshberg's expert report. Which is something that this court found in Ojo could constitute reversible error. And the second is, even if this court were to look at the details of the fact that there have been attempts to combat gang violence. That alone is not sufficient because you have to address whether or not those attempts have been successful. Because if there's just an attempt to combat gang violence, but without any success to that attempt. That may still be insufficient to not to define the acquiescence was not shown. All right, thank you. Thank you. Thank you, Ms. Bailey. Thank you, Mr. Couch. We'll reserve the shoes. We want to thank the Cravat firm for taking on this representation pro bono. Thank you. Have a good day.